# United States Court of Appeals

## For the First Circuit

No. 21-1873

DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS LOCAL LODGE 207; DAMON FAMILY LOBSTER
COMPANY, INC.; FOX ISLAND LOBSTER COMPANY, LLC; FRANK THOMPSON,

Plaintiffs, Appellees,

v.

GINA M. RAIMONDO, in her official capacity as Secretary of the
United States Department of Commerce; JANET COIT, in her
official capacity as Assistant Administrator of the NOAA
Fisheries; NATIONAL MARINE FISHERIES SERVICE,

Defendants, Appellants.

---

No. 21-1874

DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS LOCAL LODGE 207; DAMON FAMILY LOBSTER
COMPANY, INC.; FOX ISLAND LOBSTER COMPANY, LLC; FRANK THOMPSON,

Plaintiffs, Appellees.

v.

CENTER FOR BIOLOGICAL DIVERSITY; CONSERVATION LAW FOUNDATION,
INC.; DEFENDERS OF WILDLIFE,

Intervenor-Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

---

Before

Kayatta, Barron, and Gelpí,
<u>Circuit Judges</u>.

———————————

        <u>Erika B. Kranz</u>, <u>Todd Kim</u>, Assistant Attorney General, <u>Andrew C. Mergen</u>, <u>Alison C. Finnegan</u>, and <u>Taylor A. Mayhall</u> on brief for appellants Gina M. Raimondo, Janet Coit, and National Marine Fisheries Service.
        <u>Kristen Monsell</u>, <u>Erika A. Fuller</u>, and <u>Jane P. Davenport</u> on brief for intervenor-appellants Center for Biological Diversity, Conservation Law Foundation, Inc., and Defenders of Wildlife.
        <u>Jay P. McCloskey</u>, <u>Paula D. Silsby</u>, <u>Thimi R. Mina</u>, <u>Alfred C. Frawley IV</u>, and <u>McCloskey, Mina, Cunniff & Frawley, LLC</u> on brief for appellees District 4 Lodge of the International Association of Machinists and Aerospace Workers Local Lodge 207, Damon Family Lobster Company, Inc., Fox Island Lobster Company, LLC, and Frank Thompson.
        <u>Ryan P. Steen</u>, <u>Stoel Rives LLP</u>, <u>Mary Anne Mason</u>, General Counsel, Maine Lobsterman's Association, <u>Jane C. Luxton</u>, <u>Kip J. Adams</u>, and <u>Lewis Brisbois Bisgaard & Smith LLP</u> on brief for Maine Lobsterman's Association, amicus curiae.

———————————

November 16, 2021

———————————

**KAYATTA**, **Circuit Judge**. This case pits the Maine lobster industry against a federal environmental agency seeking to save the endangered North Atlantic right whale from extinction. Earlier this year, the National Marine Fisheries Service (the "Agency") issued a rule barring, from October to January each year, the most frequently employed methods of lobstering in a roughly 967 square mile area of the Atlantic Ocean thirty or so nautical miles off the Maine coast. The Agency implemented this new seasonal closure to reduce the risk that a right whale would become entangled in the ropes connecting lobster traps to buoys. Prior to the closure going into effect, several individuals and an organization affected by the closure joined as plaintiffs and asked the district court to postpone the enforcement of the new rule until that court could finally decide whether the new rule is lawful. The plaintiffs' preliminary request required the district court to predict how likely it is to find the new rule unlawful at the end of the case and to consider now what harms might result in the interim should an injunction either be granted or denied. Agreeing with the plaintiffs, the district court put the new rule on ice.

The government then appealed. It argues on the merits that the district court should not have issued its preliminary injunction. By separate motion, the government also asks us to issue a stay of the district court order so that the new seasonal closure would go into effect while the appeal proceeds.

For the following reasons, we grant the government's motion. As we will explain, the district court misapprehended the record and over-stepped its role in rejecting the judgments of the agency that Congress has charged with protecting endangered marine mammals. And, while there are serious stakes on both sides, Congress has placed its thumb on the scale for the whales.

## I.

Congress enacted the Marine Mammal Protection Act nearly fifty years ago to ensure that marine mammals -- like the North Atlantic right whale -- are not "permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). In 2019, the Agency estimated there were no more than 368 right whales left in the ocean, and the Agency has determined that no more than eight right whales, on average, can be "taken" every ten years if they are to reach their optimum sustainable population.[1] In other words, even one additional death a year increases the odds that the right whale will go extinct.

Entanglement in trap lines is a leading cause of serious injury and death in right whales, who otherwise live on average for four to seven decades. Nat'l Marine Fisheries Serv.,

---

[1] "Take" is a term of art meaning, in brief, an action that captures, kills, or has the potential to injure a marine mammal, or one that has the potential to disrupt its behavioral pattern. 16 U.S.C. § 1362(13), (18).

Biological Opinion (BiOp) 80, 136 (May 27, 2021). The Agency estimates that just under five right whales per year suffer serious injury or death due to entanglement in federally regulated fisheries.

Because of the critical nature of the right whale's population levels, there has long been federal regulation of certain fisheries aimed at reducing whale buoy and line entanglement. Most recently, an unexplained uptick in deaths in 2017[2] prompted the Agency to act anew. It reconvened the Atlantic Large Whale Take Reduction Team -- which includes members of the fishing and lobstering industries -- to propose amendments to the Atlantic Large Whale Take Reduction Plan. The Team, and later the Agency, considered several types of actions, including certain restrictions of fishing gear -- like requiring weaker lines -- and seasonal closure of particularly risky fishing areas.

In deciding which actions to take, the Agency used a peer-reviewed "Decision Support Tool" (the "model"). The model identifies so-called "hotspots" where right whales are most in danger based on where vertical buoy lines are likely to be, how strong those lines are likely to be, and where whales are likely to be. Nat'l Marine Fisheries Serv., Final Environmental Impact

---

[2] In 2017, seventeen right whale deaths were documented, and new information demonstrated a downward trend in the species' population since 2010.

Statement (FEIS) 73-74 (June 2021). An area may be a hotspot even if only a few whales are predicted to be there if there are a plethora of strong vertical fishing lines. The Agency employed these inputs "because entanglement risk only exists when lines are present, whales are present, and the lines pose a risk to whales." Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations ("Final Rule"), 86 Fed. Reg. 51,970, 51,991 (Sept. 17, 2021). Thus, "if any of these three factors are not present, the risk of entanglement [from the model] is zero." Id.

Based on this model, one of the actions the Agency proposed was to restrict fishing with buoy lines from October 18 to January 31 in a roughly 967 square mile area of the Atlantic Ocean thirty or so nautical miles off the Maine coast ("LMA 1 restricted area"). Representatives of the lobster industry issued comments questioning the inputs of the model, whether any whales are likely to enter that area, and whether there had been any concrete data of a right whale being injured by buoy lines in that area. On August 31, 2021, the Agency issued a final rule in which it responded to these comments but nevertheless retained the seasonal closure, as set to go into effect on October 18.

Plaintiffs -- individual lobster harvesters and a lobstering union -- sued the Agency on September 27, 2021, claiming that the closure of the restricted area was arbitrary and

capricious.[3]  A week later, the plaintiffs moved for a temporary restraining order and preliminary injunction, seeking to block the seasonal closure from going into effect.  After briefing and a hearing, the district court agreed that the plaintiffs are likely to succeed on the merits.  It found that the Agency likely acted arbitrarily and capriciously by closing the fishery "based on what appears to be a markedly thin statistical modeling methodology," which "ignored . . . whether right whales actually aggregate in the" restricted area.  It concluded that while the Agency has the authority to impose the seasonal closure, it could not do so until "traditional" evidence "either substantiate[s] or contradict[s] its modeling effort."

The district court then found that the plaintiffs met their burden (for preliminary relief) to show irreparable injury because their compliance cost is "significant" and because the rule would result in the "permanent loss of their existing fishing grounds."  Finally, the district court concluded that the public interest was on the plaintiffs' side -- despite the fact that it generally "tips heavily in favor of protected species," Strahan v.

---

[3]  Once plaintiffs sued the Agency, several conservation groups with an interest in protecting the right whale intervened. Those groups -- Conservation Law Foundation, Defenders of Wildlife, and Center for Biological Diversity -- are parties to this appeal and have filed their own motion for a stay.  Given our disposition of the Agency's motion, we will deny the conservation groups' motion as moot.

Coxe, 127 F.3d 155, 171 (1st Cir. 1997) -- because "there is an overriding public interest in insisting on orderly and epistemically sound rulemaking that members of the public have reason to believe is grounded in reality." Based on those findings, the district court enjoined the seasonal closure from going into effect two days before it was set to do so.

The Agency appealed and moved the district court for a stay pending appeal, in essence asking the district court to permit the closure to go into effect while it sought review of the preliminary injunction order. The district court denied that motion two weeks later. The same day, the Agency moved for similar relief in this court. After a review of the record and a consideration of the stay factors, we now grant the Agency's motion.

## II.

In ruling on a motion for a stay pending appeal, we consider "(1) [w]hether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether [the] issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." Common Cause R.I. v. Gorbea, 970 F.3d 11, 14 (1st Cir. 2020) (second alteration in original) (quoting Nken

v. Holder, 556 U.S. 418, 426 (2009)). "The first two factors 'are the most critical.'" Id. (quoting Nken, 556 U.S. at 426).

## A.

Determining the likelihood of the Agency's success in this appeal requires us to determine the likelihood that the district court itself erred in issuing a preliminary injunction. To the extent the district court's ruling rested on findings of fact, we defer to those findings absent clear error; we review any questions of law de novo, without deference. Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc., 704 F.3d 44, 48 (1st Cir. 2013).

We begin with the clear policy choices made by Congress in instructing the Agency to protect right whales, even if that protection causes harm to commercial fishing operations. We do not make policy determinations; the branches accountable to voters do that. Rather, we serve as a backstop to ensure an executive agency does not act arbitrarily and capriciously or not in accordance with law. 5 U.S.C. § 706(2)(A).

Two statutes call for the Agency to take swift action to protect the endangered right whale: Section 7 of the Endangered Species Act (ESA) requires the Agency to ensure that its fishing licenses are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). The Marine Mammal Protection Act (MMPA), in turn, makes it "the immediate

goal that the incidental mortality or serious injury of marine mammals occurring in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate" and requires the Agency to "develop and implement a take reduction plan," whose "immediate goal" is "to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock." 16 U.S.C. § 1387(a)(1), (f)(2), (f)(5). Indeed, the MMPA requires the Agency "to assist in the recovery or prevent the depletion of" endangered marine mammals that "interact[] with commercial fisheries." Id. § 1387(f)(1).

The potential biological removal (PBR) level for the right whale is currently 0.8, which means that the removal of more than eight individuals every ten years (i.e., an average of 0.8 per year) threatens the species' ability to reach its optimal sustainable population level.[4] Of all the large whales, only the right whale population consistently experiences annual takes in excess of its PBR level. In fact, an "annual average of five entanglement-related mortalities and serious injuries were

_____

[4] The PBR levels of marine mammals are also determined by the Agency, and we note that plaintiffs do not challenge this number here.

documented from 2009 through 2018." Final Rule, 86 Fed. Reg. at 51,971. The discrepancy between annual right whale deaths and the species' PBR level required the Agency to act. 16 U.S.C. § 1387(f)(7)(F). And, because the trend is "toward species extinction," the licensing of the federal fisheries for lobster harvesting implicates the ESA, in which Congress opted as a matter of policy to require the Agency to act "whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) (finding that the ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost" (emphasis added)); see also 16 U.S.C. § 1361(6) (requiring the Agency to ensure endangered marine mammals, including the right while, are "protected and encouraged to develop to the greatest extent feasible").

Whenever an administrative agency acts, it must follow the applicable administrative rules of procedure. See 5 U.S.C. § 553 (detailing requirements for agency rulemaking); 16 U.S.C. § 1387(f) (detailing requirements for agency action when an endangered marine mammal is being taken at a rate higher than its PBR level); see also BiOp at 1 (explaining that section 7 of the ESA requires the Agency to "conduct intra-service consultation" when it is "proposing an action that may affect listed species"). Here, though, the plaintiffs offer no reason to question the Agency's compliance with these procedural requirements. Most

importantly, the Agency proposed and explained its new rule, solicited public comment on the proposed rule, and considered those comments -- including all comments from participants or representatives of the lobster industry -- before finally issuing the rule.

The district court (in passing) and the plaintiffs on appeal complain that the seasonal-closure regulation did not go through a collaborative process with the Atlantic Large Whale Take Reduction Team (the "Team"), but no party points us to any requirement that every aspect of a take plan be discussed by the Team. Rather, the Team is an advisory body. As the Agency explained, "While the [Team] provides recommendations, and [the Agency] makes every effort to incorporate those recommendations, it is ultimately [the Agency's] responsibility to meet the mandates of the MMPA." Record of Decision for the FEIS (ROD) 24 (Aug. 30, 2021); see also 16 U.S.C. § 1387(f)(7)(B)(i) (permitting the Agency to make "changes . . . with an explanation of the reasons" to any plan drafted by the Team); id. § 1387(f)(7)(B)(ii) (requiring the Agency to publish its own "proposed take reduction plan and implementing regulations" if the Team "does not submit a draft plan . . . within 6 months").

With Congress having thus mandated action to protect the right whale from commercial fishing, and with plaintiffs pointing to no procedural failure by the Agency in deciding what action to

take, the district court had only a narrow role to play. A court can set aside an otherwise proper agency action if it is arbitrary and capricious or if it is not based on substantial evidence.[5] 5 U.S.C. § 706(2)(A), (E). The district court found that plaintiffs had made a showing that the Agency rule in this case was likely arbitrary and capricious. In so doing, the district court claimed that the Agency's action fell short because it failed to consider what the district court decreed was an "important aspect of the problem," see Upper Blackstone Water Pollution Abatement Dist. v. EPA, 690 F.3d 9, 20 (1st Cir. 2012) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)), namely "whether right whales actually aggregate in the LMA 1 Restricted Area." The court explained that that the Agency "predicts the presence of right whales during the LMA 1 closure period in spring" and that "the warming of the Gulf of Maine has shifted right whales 'south of New England and Long Island in the fall and winter.'" (quoting BiOp at 187). From those observations, the court concluded that the Agency likely did not time the closure to coincide with the presence of whales.

---

[5] The Supreme Court "has described the APA court/agency 'substantial evidence' standard as requiring a court to ask whether a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

That reasoning constituted a fundamental misapprehension of the Agency's analysis. Whale death by entanglement requires the intersection of two objects: a line and a whale. As the Agency explained, and as its model assumes, the risk of entanglement therefore varies based on the number of lines and the number of whales in a given area. A large number of whales can certainly pose a significant risk in the presence of even relatively few lines, but just a few whales can also pose a significant risk in the presence of a large number of lines.

This type of scenario -- few whales/many lines -- was just what the Agency confronted in the LMA 1 restricted area during the winter months. Its peer reviewed "co-occurrence model" projected both that some right whales would be present in the winter months, FEIS at 81, and that the proliferation of trap lines would pose a substantial risk to those whales, see FEIS at 73, 78, 81. So the district court's central criticism based on the fact that the data showed (as the Agency itself pointed out) that whales only aggregated in the area at other times provides no basis for rejecting the Agency's findings.

The district court also criticized the agency's use of its "co-occurrence model" absent a better explanation of the inputs, and the court made no bones about the fact that it would prefer to have -- and indeed require -- "traditional," concrete evidence of right whales within the restricted area. But an agency

- 14 -

may use a model in determining what actions will likely achieve its goals. Scientists regularly use models to understand complex interactions and predict likely future occurrences (like, for example, the weather in two days). The use of a model is reasonable where it reflects "the best information available when [the agency] began its analysis," and where it has "check[ed] the assumptions of those models as new information became available." Village of Bensenville v. FAA, 457 F.3d 52, 71 (D.C. Cir. 2006). The Agency appears to have done both here. The model included "[d]ata from recent gliders operating in offshore Maine waters during December and January in 2018 and 2019 [that] detected the presence of right whales, with positive detections within an area in the season and within the boundaries selected" with the model, FEIS at 81, and the Agency considered "supplementary acoustic data" on top of the "data [it] already had on predicted whale density in this area according to the new 2010 to 2018 model" when developing the restricted area, ROD at 22. In addition, the Agency went through an iterative process to narrow the restricted area to the riskiest area. FEIS at 81 ("The final borders around these areas were drawn through an iterative process, testing the risk reduction offered in each version with the [co-occurrence model] and selecting an area that is robust to annual shifts in predicted whale distribution without being larger than is necessary.").

The Agency also included in the model the new data regarding a post-2010 shift in right whale migrating patterns, yet the model "still showed substantial risk reduction occurring in these hotspots suggesting these areas remain relatively important between 2010 and 2018." FEIS at 81. And it obtained favorable, independent peer review of the model by knowledgeable scientists. Id. at 74-75. Thus, the Agency did everything it was supposed to do when using a model: It relied on the best evidence it had available and updated the inputs as new information emerged. Village of Bensenville, 457 F.3d at 71. Accordingly, the Agency's use of the model very likely was not arbitrary and capricious, and the resulting regulation appears to be supported by substantial evidence. See United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963) (explaining that the "'substantial evidence' . . . standard goes to the reasonableness of what the agency did on the basis of the evidence before it, for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body").

The district court also faulted the Agency for simply not waiting for further "concrete" evidence of whales in the area. But the Agency persuades us, at least preliminarily, that Congress did not require the Agency to wait for more data, much less to wait until the whales are swimming among an aggregation of life-threatening lines. See 16 U.S.C. § 1387(f)(7) (requiring quick

action when "the human-caused mortality and serious injury [of the right whale] is estimated to be equal to or greater than [its] potential biological removal level . . . and [the whale] interacts with a fishery."); see also Brower v. Evans, 257 F.3d 1058, 1070 (9th Cir. 2001) ("Scientific findings in marine mammal conservation area are often necessarily made from incomplete or imperfect information."). See generally FCC v. Prometheus Radio Project, 141 S. Ct. 1150, 1160 (2021) ("[It] is not unusual in day-to-day agency decisionmaking within the Executive Branch" for an agency to lack "perfect empirical or statistical data.").

The district court expressed concern that, by considering both the density of whales in an area and the density of dangerous buoy lines, the model might "simply use[] math in a manner that makes a reduction in line density appear statistically meaningful even in the absence of passing whales." But the Agency explained that was not how the model worked. Final Rule, 86 Fed. Reg. at 51,991 ("It is appropriate for the threat model to be equally weighted with line and whale density because entanglement risk only exists when lines are present, whales are present, and the lines pose a risk to whales. If any of these three factors are not present, the risk of entanglement is zero." (emphasis added)).

Finally, the district court faulted the Agency because the "available record of known large whale entanglements . . . between 2010 and 2019 offers little to support outright closure of LMA 1," as none of the known cases have come from the Gulf of Maine.  But this conclusion overlooks the problem confronting the Agency.  Scientists cannot trace most known entanglements to specific fisheries.  BiOp at 216 ("Assignment of an observed entanglement event to a specific fishery or country of origin is rarely possible."); Final Rule, 86 Fed. Reg. at 51,976 ("Out of approximately 1.24 million buoy lines within the Northeast waters from Rhode Island to Maine, we estimate that 72 percent of buoy lines were unmarked under current [take reduction plan] gear marking guidelines although that percentage was reduced when Maine required gear marks on lobster trap buoy lines beginning in September 2020.").  And, because many whale carcasses are never recovered, there are even more entanglements that are unknown.  BiOp at 212 ("Some whale mortalities may never be observed; thus, the annual observed entanglement-related mortalities are likely less than the actual number of entanglement-related mortalities occurring."); see also FEIS at 55–56 ("[M]any entanglements are never seen by humans, even when seen there is often no gear present on whales showing scars, wounds and injuries clearly caused by entanglement, gear cannot always be recovered from those whales that are seen entangled, and even when gear is recovered, it can

rarely be identified to a source fishery, and even more rarely to a precise fishing location. . . . [T]herefore, most entanglement related mortality and serious injury are unassigned."). Accordingly, the lack of a specific case of entanglement attributable to a given area does not mean none have happened in that area or that there is no risk one will happen there in the future. That is precisely why the Agency developed the model and subjected its key inputs to review and comment. And the result accords with common sense: Entanglements are a function of whales swimming near lines, with the likelihood of a death increasing as the number of either increases.

None of this is to discount entirely the district court's correct observation that the modeling employed by the Agency, in several important instances, relied on estimates of uncertain events (such as entanglement risks in given areas), rather than hard, verifiable numbers. We see no scientific basis, though, for categorically rejecting an agency's use of well-considered estimates. See generally H.C. von Baeyer, The Fermi Solution: Essays on Science 3-12 (1993). Importantly, the Agency subjected its estimates to peer review and, as we have discussed, supra, did indeed explain how its estimates comported with and were derived from the hard data that was available.

Trying to leverage the case for demanding more hard data (and perhaps to undercut the Agency's case for irreparable harm),

the plaintiffs have asked that we go outside the record to consider the acoustic data from a glider mission that occurred in October 2021, which did not find evidence of right whales near the restricted area. They claim that this undermines the Agency's model. We take the plaintiffs' invitation to look at recent acoustic data, but find it cuts the other way. More recent acoustic data posted on the NOAA website shows just what the Agency modeling predicted: right whale acoustics in and around the LMA 1 restricted area. See NOAA, Right Whale Sighting Advisory System, https://apps-nefsc.fisheries.noaa.gov/psb/surveys/Mapperiframe WithText.html (last accessed Nov. 16, 2021). These data illustrate the benefits of the Agency's decision to act on the basis of its model rather than simply assume that no whales are imperiled in the LMA-1 restricted area during the winter months.

On the whole, the Agency has made a strong showing of likelihood of success on the merits.

**B.**

We next turn our attention to the harms that may be suffered depending on whether the closure is enjoined during this appeal. As a practical matter, this discussion also addresses to the extent necessary the balance of equities and the public interest.

**1.**

"[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (second alteration added) (quoting New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); see also Thompson v. DeWine, 976 F.3d 610, 619 (6th Cir. 2020); Org. for Black Struggle v. Ashcroft, 978 F.3d 603, 609 (8th Cir. 2020); N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior, 854 F.3d 1236, 1254-55 (10th Cir. 2017); Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 419 (5th Cir. 2013).

Here, moreover, the enjoined agency action is aimed at effectuating a congressional command to avoid licensing activity that may itself cause irreparable harm: the extinction of a marine mammal species. Right whales appear to have been killed in recent years by entanglement at a rate that will lead to their extinction. The Agency rule is intended to take a major, but not yet sufficient, step in reducing those deaths. The Agency's model estimates that the new rule, of which the seasonal ban in the LMA-1 restricted area is a part, will reduce deaths by entanglement by 60%, to an annual average of 2.69 whales. Compare N. Atl. Right Whale Conservation Framework, BiOp App'x A at 478 (explaining that

the 2021 rulemaking is "focused on 60% reduction in right whale [takes] incidental to the American lobster and Jonah crab trap/pot fisheries. In federal waters, this action reduces [takes] from entanglement, on average annually, to 2.69."), with FEIS at 76 tbl.3.1 (labeling the 60% as "risk reduction").[6] The seasonal ban at issue here accounts for over 10% of that reduction, which would seem to approximate roughly one whale saved every three or four years. See ROD at 21. While the risk reduction attributable to the challenged seasonal closure seems small -- 6.6% -- it is an important part of a larger, interrelated regulatory scheme. As the Agency explained, "[i]ndividual risk reduction associated with one measure is not as accurate as the combined risk reduction of measures implemented together because it does not account for changes in line numbers or distribution associated with other measures nearby." ROD at 21. Thus, "[w]ithout this area, the [regulatory rule] would likely not meet the minimum risk reduction target needed to reduce mortality and serious injury of right whales below PBR." Id. On top of that, the 2021 Rule is just the first step in a 10-year plan aimed at trying to turn the trajectory of the right whale around. See, e.g., id. at 59-60 (explaining

---

[6] The percentage rises to 69% if action already taken to restrict harvesting in the ocean off of Massachusetts is taken into consideration. Even that percentage falls short of the Agency's "upper target" of 80%, and short of what the Agency expects will be needed to lower the annual deaths below the PBR more quickly. FEIS at 5.

that it "may require up to 92 percent . . . to reduce actual estimated mortality and serious injury below PBR," given "recent mortality conditions").

## 2.

On the other hand, there is the harm that will befall the plaintiffs should the ban apply. One would think that harm would be much easier to quantify. As discussed, the Agency estimated that this seasonal closure would impose costs between roughly $635,000 and $1.25 million.[7] Plaintiffs in their briefs challenge that estimate. But the evidence backing that challenge is, to say the least, sketchy. It consists of an affidavit submitted not by any plaintiff, but by a third party who claims that one plaintiff told her that the seasonal ban will cost his business $5 million in revenue (it is unclear whether this is annually or over the life of the closure), while the other plaintiff told her that the ban would reduce his company's lobster haul by 1-1.3 million pounds. Olsen Decl. ¶ 17. Neither individual plaintiff backs up these numbers with any evidence at all, and neither the plaintiffs nor even their third-party, hearsay proxy offers any calculations to support these numbers. No witness claims that any plaintiff will go out of business as a result of

---

[7] The district court mistakenly relied on the Agency's estimation of the annual cost of compliance for the entire rulemaking -- $9.8-19.2 million -- which covers much more than the seasonal closure challenged here.

the plan. Nor is there any evidence in the record to support the district court's statements suggesting that the new rule will cause a permanent loss of plaintiff's formal or informal rights to fish in the closed area even after a possible reopening, if and when the closure is lifted in coming years.

That being said, even taking just the Agency's estimates, it is fair to infer that a financial loss of a relatively small percentage to the industry as a whole will be borne primarily by those who set traps annually in the restricted area. And as such we do not doubt that it presents a major financial hardship for those individuals.

**3.**

The difficult question, then, is how does one balance that increased risk of impeding Congress's aims and increasing right whale fatality against the certain risk of economic harm to the plaintiffs? In this instance, we answer that question by looking to Congress for guidance. See Strahan, 127 F.3d at 171; see also Tenn. Valley Auth., 437 U.S. at 184 (finding that the ESA embodies Congress's "plain intent . . . to halt and reverse the trend toward species extinction, whatever the cost").

The plaintiffs identify no case in which we have permitted an injunction to stand against the government's authority to implement duly enacted laws, notwithstanding its strong likelihood of success, let alone in a case in which the

laws the government seeks to implement are aimed at the protection of an endangered species and when the only alleged injury is of an economic kind. See Strahan, 127 F.3d at 171 ("Under the ESA, however, the balancing and public interest prongs have been answered by Congress's determination that the 'balance of hardships and the public interest tips heavily in favor of protected species.'" (quoting Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir.1994))); Water Keeper All. v. U.S. Dep't of Defense, 271 F.3d 21, 34 (1st Cir. 2001) (differentiating Strahan on the grounds that "the harm asserted by the navy implicates national security and therefore deserves greater weight than the economic harm at issue in Strahan").

In this unusual case, our consideration of the competing harms is also informed by our assessment of the likely outcome of this litigation. As we have explained, it is likely that the Agency ruling at issue here will be sustained given the deference that a court must accord to executive agencies carrying out congressional mandates. In that event, if any whales are lost -- or presumed lost -- because the ban was stayed, the Agency may need to modify its actions going forward to make up for what it had expected to be gains made this year. See BiOp at 7. Any such actions could operate more harshly on harvesters by having to achieve the same aggregate results in fewer years. In this

respect, prevailing on the stay could cause lobster harvesters additional harm.

For all of these reasons, while recognizing the burden placed on the plaintiffs by the Agency's ruling, we find that leaving the injunction in place during the course of this appeal will likely cause irreparable harm in the form of preventing a federal agency from undertaking its congressionally assigned task of assuring the right whales are protected from a critical risk of death. And in so requiring, Congress has effectively declared the public interest and weighed the equities in accord with the balance struck by the Agency. Strahan, 127 F.3d at 171. Whether the statutory framework that requires this result should be changed is up to Congress, not the courts.

## III.

For the foregoing reasons, the Agency's motion for a stay pending appeal is granted, and, consequently, the intervenors' parallel motion is denied as moot.

While retaining jurisdiction over the appeal of the preliminary injunction on the merits, we remand to the district court to resolve, if necessary, any disputes concerning the prompt removal of the banned gear from the LMA-1 restricted area. Given the already lost time and the short period remaining for the seasonal closure, we encourage the parties to act promptly.