# United States Court of Appeals

## For the First Circuit

No. 21-1873

DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS LOCAL LODGE 207; DAMON FAMILY LOBSTER
COMPANY, INC.; FOX ISLAND LOBSTER COMPANY, LLC; FRANK THOMPSON,

Plaintiffs, Appellees,

v.

GINA M. RAIMONDO, in her official capacity as Secretary of the
United States Department of Commerce; JANET COIT, in her
official capacity as Assistant Administrator of the NOAA
Fisheries; NATIONAL MARINE FISHERIES SERVICE,

Defendants, Appellants.

No. 21-1874

DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS LOCAL LODGE 207; DAMON FAMILY LOBSTER
COMPANY, INC.; FOX ISLAND LOBSTER COMPANY, LLC; FRANK THOMPSON,

Plaintiffs, Appellees,

v.

CENTER FOR BIOLOGICAL DIVERSITY; CONSERVATION LAW FOUNDATION,
INC.; DEFENDERS OF WILDLIFE,

Intervenor-Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, <u>U.S. District Judge</u>]

Before

Lynch, Kayatta, and Gelpí
<u>Circuit Judges</u>.

————————————

     <u>Rachel E. Heron</u>, Attorney, Environment & National Resources
Division, Department of Justice, with whom <u>Todd Kim</u>, Assistant
Attorney General, Environment & National Resources Division,
Department of Justice, <u>Andrew C. Mergen</u>, <u>Alison C. Finnegan</u>, <u>Brett
Grosko</u>, <u>Taylor A. Mayhall</u>, and <u>Erika B. Kranz</u>, Attorneys,
Environment & National Resources Division, Department of Justice,
<u>Darcie N. McElwee</u>, United States Attorney, U.S. Attorney's Office,
District of Maine, <u>John G. Osborn</u>, Chief, Civil Division, U.S.
Attorney's Office, District of Maine, and <u>John Almeida</u>, Attorney-
Advisor, National Oceanic & Atmospheric Administration, were on
brief, for federal appellants.
     <u>Kristen Monsell</u>, with whom <u>Erica A. Fuller</u> and <u>Jane P.
Davenport</u> were on brief, for intervenor-appellants.
     <u>Alfred C. Frawley IV</u>, with whom <u>Jay P. McCloskey</u>, <u>Paula D.
Silsby</u>, <u>Thimi R. Mina</u>, and <u>McCloskey, Mina, Cunniff & Frawley, LLC</u>
were on brief, for appellees.

————————————

July 12, 2022

————————————

**KAYATTA**, <u>Circuit Judge</u>.  In August 2021, the National Marine Fisheries Service (the "Agency") issued a regulation that, among other things, prohibited lobster fishing with vertical buoy lines (the most common form of lobster fishing) each year between mid-October and January in a 967 square mile zone of the Atlantic Ocean, dubbed the LMA 1 Restricted Area.  The stated purpose of this seasonal closure was to guard against the possibility that the large proliferation of lobster trap lines customarily placed in the LMA 1 Restricted Area during that time would cause the death of one or more of the few, severely endangered North Atlantic right whales that the Agency estimated could travel in that area during those months.

Plaintiffs -- a union of lobster fishers, two lobster-fishing companies, and an individual lobster fisher -- challenged the regulation as arbitrary and capricious in United States district court, seeking an injunction barring the seasonal closure of the LMA 1 Restricted Area to buoy-line lobster fishing.  After the district court granted a preliminary injunction enjoining enforcement of the seasonal closure, the federal government and intervening conservation groups appealed and sought a stay of the district court's order.

After briefing and careful consideration of both the district court's ruling and the record, we stayed the preliminary injunction.  See <u>Dist. 4 Lodge of the Int'l Ass'n of Machinists</u>

Loc. Lodge 207 v. Raimondo, 18 F.4th 38, 49-50 (1st Cir. 2021). In an unusually extensive stay order, we spelled out in detail why we found it unlikely that plaintiffs would prevail on appeal. We determined that the Agency most likely did not exceed the bounds of its wide discretion in factfinding by relying on statistical modeling to define the time and place of the seasonal closure. Id. at 45-46. We also found that the Agency adequately supported the reasonableness of its admittedly imprecise inputs for that model. Id. at 46-47. We then explained that Congress had already placed a heavy thumb on the whale-side of the equities' scale, and we did not see enough countervailing evidence to tip it the other way. Id. at 47-49.

The appeal then proceeded to full briefing on the merits of the government's challenge to the now-stayed injunction. And since we consider basically the same factors when reviewing a preliminary injunction on the merits as we do in considering a stay motion, compare Winter v. NRDC, 555 U.S. 7, 20 (2008) (laying out four-part test for preliminary injunctions), with Nken v. Holder, 556 U.S. 418, 434 (2009) (laying out a similar test for motions seeking a stay pending appeal), the handwriting was on the wall for the appeal itself, so to speak.

Nevertheless, the possibility remained that in deciding the stay motion on a necessarily expedited schedule, we might have misapprehended the record or misread some authority. So, with the

benefit of having our opinion on the stay motion, plaintiffs had the opportunity to file a brief explaining specifically what factual or legal error may have led us astray. Plaintiffs have not done so. Rather, they have filed a brief that makes nearly no effort to engage with our prior opinion. Even with more time and a target to attack, plaintiffs have failed to give us any reason to alter our initial analysis. We therefore vacate the preliminary injunction and remand for further proceedings. Our reasoning, with additional detail, follows.

**I.**

We assume familiarity with the background of this case as laid out in our order granting the stay pending appeal, see Dist. 4 Lodge, 18 F.4th at 41-42, but we briefly summarize the dispute to enhance the readability of this stand-alone opinion.

The North Atlantic right whale is severely endangered. In 2019, the Agency estimated that "even one additional death a year increases the odds that the right whale will go extinct." Id. at 41. "Entanglement in trap lines is a leading cause of serious injury and death in right whales, who otherwise live on average for four to seven decades." Id. "The Agency estimates that just under five right whales per year suffer serious injury or death due to entanglement in federally regulated fisheries." Id.

Following an unexplained uptick in right whale deaths in 2017, the Agency began considering several responses, including restrictions on certain fishing gear and seasonal closure of particularly risky fishing areas. Id. Relying on a peer-reviewed "Decision Support Tool" -- a model designed to identify danger zones for right whales -- the Agency decided to restrict "fishing with buoy lines from October 18 to January 31 in a roughly 967 square mile area of the Atlantic Ocean thirty or so nautical miles off the Maine coast." Id. This seasonal closure is what was enjoined by the district court and is the subject of this appeal.

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "The first two factors are the most important." Together Emps. v. Mass Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022) (citing Nken, 556 U.S. at 434).

We review the entry of a preliminary injunction for "abuse of discretion." Water Keeper All. v. Dep't of Def., 271 F.3d 21, 30 (1st Cir. 2001). "This deferential standard, however, applies to 'issues of judgment and balancing of conflicting

- 6 -

factors,' and we still review rulings on abstract legal issues de novo and findings of fact for clear error." Id. (quoting Cablevision of Bos., Inc. v. Pub. Improvement Comm'n, 184 F.3d 88, 96 (1st Cir. 1999)). "We consequently review the district court's legal findings under the 'likelihood of success' prong de novo" and "the district court's judgment calls, applying appropriate standards, under the remaining three prongs for abuse of discretion." Id. at 30-31.

## A.

In its view of the merits, the district court found that the Agency likely acted arbitrarily and capriciously by closing the fishery "based on what appear[ed]" to the court "to be a markedly thin statistical modeling methodology." Dist. 4 Lodge of Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo, No. 21-cv-275, 2021 WL 4823269, at *11 (D. Me. Oct. 16, 2021). The court also found that the Agency "ignored . . . a core aspect of the problem," namely "whether right whales actually aggregate in the LMA 1 Restricted Area." Id. at *12. It then concluded that, although the Agency had the authority to impose the seasonal closure, it could not do so until "traditional" evidence "either substantiate[s] or contradict[s] its modeling effort." Id. at *8, *12.

We explained in detail in our stay order how the district court misapprehended the problem facing the Agency and improperly

substituted its judgment for that of the Agency. See Dist. 4 Lodge, 18 F.4th at 44-47 (explaining that "[w]hale death by entanglement requires the intersection of two objects: a line and a whale," such that while "[a] large number of whales can certainly pose a significant risk in the presence of even relatively few lines," "just a few whales can also pose a significant risk in the presence of a large number of lines"). We adopt those conclusions here and focus instead on a handful of new or re-framed arguments plaintiffs have since raised.

We begin with plaintiffs' only attempt to confront our reasoning in granting the stay. On page 38 of their brief, plaintiffs argue that we were led astray in reaching the conclusion that the Agency "did everything it was supposed to do when using a model[] [by] rel[ying] on the best evidence it had available and updat[ing] the inputs as new information emerged." See Dist. 4 Lodge, 18 F.4th at 45 (citing Village of Bensenville v. FAA, 457 F.3d 52, 71 (D.C. Cir. 2006)). They contend that the Agency "made no effort to verify [its assumptions] with concrete data" and that the data it did have showed no whale presence in the LMA 1 Restricted Area during the season in question. In other words, the Agency should not be permitted to rely on "substantial uncertainty" when it could have, according to plaintiffs, obtained more concrete data.

- 8 -

This argument tangles together two contentions: (1) that the Agency ignored existing data, and (2) that the Agency could have and should have gathered additional, better data before imposing the seasonal closure of the LMA 1 Restricted Area. As to the first, plaintiffs' brief does not point to any relevant existing data supposedly ignored by the Agency. Plaintiffs argue repeatedly that the existing data only showed that, since about 2010, right whales have moved away from the Gulf of Maine during the winter months and "aggregate" in places other than the LMA 1 Restricted Area, but the Agency did not ignore this fact. Rather, the Agency explicitly acknowledged that the Gulf of Maine "is slightly less important for right whales in recent years than previously," but it nevertheless concluded that this area "remains a potential hotspot for right whales during late fall and early winter months" and that "acoustic data have still detected right whales in this area in recent years." Nat'l Marine Fisheries Serv., Final Environmental Impact Statement, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for Amending the Atlantic Large Whale Take Reduction Plan: Risk Reduction Rule (FEIS) 81 (June 2021) ("Data from recent [acoustic] gliders operating in offshore Maine waters during December and January in 2018 and 2019 detected the presence of right whales, with positive detections within an area in the season and within the [LMA 1 Restricted Area]."); see also Nat'l Marine Fisheries Serv.,

Biological Opinion (BiOp) 187–88 (May 27, 2021) ("anticipat[ing] individual right whales to occur year round in the action area" despite "[r]ecent changes in right whale distribution"); BiOp at 210 ("Because of substantial interannual and geographic variation in whale occurrence and lack of complete data for seasonal distributions, the potential exists for whales to interact with gear used in the fisheries year-round throughout the entire action area.").[1]

As to the claim that the Agency should have affirmatively gathered more data before acting, plaintiffs point to the Agency's supposed ability to "tag and track" whales. The Agency explained, though, that tagging efforts "were halted on right whales out of concerns regarding potential health impacts" and because, "despite several decades of development, many of the technical and logistical challenges of tagging continue to limit the utility of this approach." Taking of Marine Mammals Incidental to Commercial

---

[1] In the facts section of their brief, plaintiffs repeatedly aver that "there has not been a single entanglement attributable to Maine lobster gear since 2004." But, as we explained in our stay order, "the lack of a specific case of entanglement attributable to a given area does not mean none have happened in that area or that there is no risk one will happen there in the future." Dist. 4 Lodge, 18 F.4th at 46–47. The Agency explained throughout its rulemaking that entanglements can very rarely be definitively tied to any particular fishery or location. See, e.g., FEIS at 46-48, 55-56; BiOp at 216. And "it is estimated that only an average 36 percent of all mortalities between 1990 and 2017 were detected" at all. FEIS at 46. The Agency acted reasonably in rejecting the implication that a lack of attribution suggests a lack of occurrence.

Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations ("Final Rule"), 86 Fed. Reg. 51,970, 51,994 (Sept. 17, 2021). Moreover, the Agency has continued to gather more data, as we observed in our prior opinion. See Dist. 4 Lodge, 18 F.4th at 47. In the interim, though, it was faced with a peer-reviewed model predicting that the maze of lines in the LMA 1 Restricted Area in the winter months -- coupled with the possibility that a few right whales would traverse the area -- would result in a whale fatality unless the Agency acted. So it acted, and did so under a statutory mandate to move with celerity. See 16 U.S.C. § 1387(a)(1), (f)(2), (f)(5), f(7). In such circumstances, we see no reason why it would be precluded from acting as it did. Cf. Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 61 (D.C. Cir. 2000) (concluding that it is error to require an agency to gather more data "that is arguably susceptible to discovery" if no statute requires it).

Plaintiffs also contend that data on the location of right whales in Canadian waters would have (had it been collected) undermined the Agency's decision to apportion whale deaths between the countries equally. Although the Agency acknowledged that the number of whales in Canada (and the US) is unknown at any given time, a peer-review panel determined that 50/50 apportionment was "reasonable." BiOp at 217; Final Rule, 86 Fed. Reg. at 51,976. Plaintiffs claim that the peer reviewers disagreed with this

- 11 -

apportionment. To the contrary, while the reviewers disagreed with the accuracy of the precise allocation, they nonetheless affirmed that a 50/50 split was reasonable. BiOp at 217. The Agency's explanation and reliance on the peer-review panel is enough to pass arbitrary-and-capricious review; we do not require perfect accuracy.

Next, plaintiffs contend that seasonal closure of the LMA 1 Restricted Area contradicted the Agency's own formulation of its mandate without adequate explanation. According to plaintiffs, the Agency is bound by statements that said that it would "[d]irect the most protections to areas of predictable high seasonal aggregations of right whales" and that its "primary goal was to find areas and seasons where there was an increased likelihood of right whale presence while minimizing undesirable consequences." FEIS at 75, 78. Plaintiffs, however, have simply plucked these isolated statements out of context from a nonexclusive list of "guiding principles," not a mandate. Id. at 75. And, in any event, the Agency stated that it was also looking for "[h]otspots of high buoy line and right whale co-occurrence," not just right whale aggregation. Id. at 78. The record simply belies plaintiffs' argument that the Agency has impermissibly "switch[ed] course."

Finally, plaintiffs fault the Agency for rejecting two alternatives proposed by commenters. They first contend that the

Agency could have done a hybrid closure with another area of the ocean where Maine lobster harvesters do not set traps. The Agency rejected that approach because it "determined that there was minimal benefit from the [other] side" as "vessels [who fish in that area of the ocean] are adopting [other] measures that provide greater risk reduction." Final Rule, 86 Fed. Reg. at 51,997. That explanation is not arbitrary and capricious. Plaintiffs also fault the Agency for rejecting "the notion of using dynamic management to protect temporary [right whale] aggregations." But the Agency explained that it lacks the resources to support an intensive surveillance program and that it lacks any real time data to develop an effective trigger for "dynamic management." Id. at 51,995–96. Though plaintiffs second-guess that decision now for a variety of reasons, we see nothing suspect about it. These complaints regarding rejected alternatives merely seem to rehash plaintiffs' main grievance: that the Agency did not "focus on areas of predictable seasonal aggregations of right whales." We have already explained why the Agency's decision not to do so was neither arbitrary nor capricious.[2]

For these reasons, and those stated in our stay order, we conclude that plaintiffs are unlikely to succeed on the merits

---

[2]  For the same reasons, we reject plaintiffs' contention that the Agency should have focused on "fishing activities in the southern states where the whales actually breed."

- 13 -

of their claim.  This factor weighs heavily against a preliminary injunction.  See ANSYS, Inc. v. Computational Dynamics N. Am., Ltd., 595 F.3d 75, 78 (1st Cir. 2010) ("The first factor, likelihood of success, is usually given particularly heavy weight.").

**B.**

That leaves for consideration the factors of irreparable harm, the balance of the equities, and the public interest. Regarding these three factors, plaintiffs offer no arguments not already taken into consideration in our opinion granting the stay of the district court's injunction.  They claim once again that the seasonal closure will "present[] a major financial hardship" to "those who set traps annually in the restricted area."  Dist. 4 Lodge, 18 F.4th at 49.  Without an injunction (or government funding), we do not doubt that.

We also do not doubt, though, that the loss of even one right whale caught in a thicket of trap lines in the LMA 1 Restricted Area would be irreversible.  So, we reiterate what we said in our stay order:  Here, "the balancing and public interest prongs have been answered by Congress's determination that the balance of hardships and the public interest tips heavily in favor of protected species."  Id. (internal quotation marks omitted) (quoting Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir. 1997)).  Indeed, Congress instructed the Agency to "halt and reverse the

- 14 -

trend toward species extinction, whatever the cost." <u>TVA</u> v. <u>Hill</u>, 437 U.S. 153, 184 (1978).  Although this does not mean the balance will always come out on the side of an endangered marine mammal, it does leave plaintiffs beating against the tide, with no more success than they had before.

### III.

For the foregoing reasons, the preliminary injunction is <u>vacated</u>, and the case is <u>remanded</u> to the district court for further proceedings consistent with this opinion.  The parties will bear their own costs.