# United States Court of Appeals
## For the First Circuit

No. 20-2051

CHE BLAKE SOSA,

Plaintiff, Appellant,

v.

MASSACHUSETS DEPARTMENT OF CORRECTION; MICHAEL L. RODRIGUES,
former Superintendent, MCI Cedar Junction, in his official and
individual capacities; CAROL HIGGINS O'BRIEN, Commissioner of
the Department of Corrections, in her official and individual
capacities; STEPHEN KENNEDY, former Deputy Superintendent of
Operations, MCI-Cedar Junction, in his official and individual
capacities; VANESSA RATTIGAN, MPCH Health Services
Administration for MCI-Cedar Junction, in her official and
individual capacities; AYSHA HAMEED, MPCH on-site Medical
Director for MCI-Cedar Junction, in her official and individual
capacities; JENNIFER VIEIRA, former MPCH Nurse Practitioner for
MCI-Cedar Junction, in her official and individual capacities;
ANN EVANS, MPCH Licensed Nurse for MCI-Cedar Junction, in her
official and individual capacities; JOANN LYNDS, former Deputy
Superintendent of Reentry and Americans with Disabilities Act
Coordinator at MCI-Cedar Junction in her official and individual
capacities; JAMES M. O'GARA, JR., Department of Correction ADA
Coordinator for Inmates, in his official and individual
capacities,

Defendants, Appellees,

JAMES SABA, former Superintendent, MCI Cedar Junction, in his
official and individual capacities; et al.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, <u>U.S. District Judge</u>]

Before

Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

————————————

Jeffrey P. Wiesner, with whom Jennifer McKinnon and Wiesner McKinnon LLP were on brief, for appellant.

Margaret Melville, Senior Litigation Counsel, Massachusetts Department of Correction, with whom Nancy Ankers White, Special Assistant Attorney General, Massachusetts Attorney General's Office, was on brief, for appellees.

————————————

August 14, 2023

————————————

**LIPEZ**, **Circuit Judge**.  Che Blake Sosa, an inmate in the custody of the Massachusetts Department of Correction ("DOC") who suffers from severe arthritis in his shoulder joints, appeals from a denial of preliminary injunctive relief.  Initially, when restraining Sosa, the DOC used "rear cuffing" -- handcuffing with his hands positioned behind him -- with a single standard handcuff.  Then he was rear cuffed using two standard handcuffs linked together, or "double cuffs."  Still later, custom handcuffs modified to have the span of double cuffs were used.  Before the district court, Sosa challenged these restraint procedures, arguing that because of the unnecessary pain they caused in his arthritic shoulders, the use of such restraints violated his rights under the Eighth Amendment and Title II of the Americans with Disabilities Act of 1990 ("ADA").

As preliminary relief for the pain caused by these alleged violations, Sosa sought a court order requiring the DOC to adopt the following procedure to restrain him when he is moved within his correctional unit: initially rear cuffing him in his cell, but with custom handcuffs that are at least three inches longer than double cuffs; then transitioning him into waist chains once he is taken out of his cell.  Approving as reasonable the DOC's procedure of rear cuffing Sosa with double cuffs-length custom handcuffs, the district court denied Sosa's request for preliminary relief.  We affirm.

**I.**

Sosa is an inmate at MCI-Cedar Junction, a DOC facility, serving sentences for multiple counts of aggravated rape and related offenses. Inmates at MCI-Cedar Junction found guilty of serious misconduct while incarcerated may be administratively sanctioned to serve time in the Departmental Disciplinary Unit ("DDU"). DDU inmates are the most dangerous inmates in the DOC's custody; most have been sanctioned for causing serious physical injuries to staff or other inmates, or for attempting to escape. Sosa was held in the DDU from 2003 to 2020, having received multiple DDU sanctions for infractions such as stabbing two prison officers resulting in life-threatening injuries, punching and biting officers, and assaulting prison staff with urine and feces. Sosa has also been sanctioned for possession of homemade weapons, attempting an escape, assaulting correctional officers and medical staff on numerous occasions, and stabbing his attorney several times with a homemade weapon while in court.

Because DDU inmates are particularly dangerous, the standard restraint policy requires them to be rear cuffed with single handcuffs whenever they leave their cells. This restraint method restricts freedom of movement to the greatest extent compared to other commonly used methods, thereby providing enhanced security.

Following an MRI scan in 2004 that showed severe osteoarthritis of his right shoulder joint, Sosa underwent therapeutic surgery on that shoulder. Between 2010 and 2017, Sosa submitted numerous medical grievances to prison administrators and medical personnel, seeking a variance from the standard method used to restrain DDU inmates because of what he reported as agonizing shoulder pain from rear cuffing with single handcuffs. Sosa's medical grievances for relief from the standard DDU restraint method were consistently denied on the grounds that no medical personnel had indicated a need for Sosa to be restrained using alternative procedures.

In addition to submitting medical grievances to prison authorities, Sosa also submitted a request for a reasonable disability accommodation to the ADA coordinator at MCI-Cedar Junction in January 2017, seeking an alternative restraint procedure. After this request was denied, he appealed to the DOC's department-level ADA coordinator. The department-level ADA coordinator upheld the denial of Sosa's request in April 2017, noting his ability to perform all his activities of daily living even with the standard restraint procedure, the lack of a medical indication for alternative procedures, and the continuing threat he posed to institutional security.

In October 2018, Sosa brought suit pro se under 42 U.S.C. § 1983 for two alleged violations of federal law by the DOC and

various DOC personnel. Sosa first alleged that, given the severe pain he experienced in his arthritic shoulders from rear cuffing with single handcuffs, the use of the standard DDU restraint method on him was cruel and unusual punishment violative of the Eighth Amendment. He further alleged that this restraint procedure violated his rights under Title II of the ADA.

In February 2019, Sosa filed pro se a motion for a preliminary injunction ("February 2019 motion") to require the DOC and its personnel to change the procedure used to restrain him when he is removed from his cell. Specifically, Sosa requested an order for the defendants (1) to stop rear cuffing him with single handcuffs, and (2) to use waist chains to restrain him when he is taken out of his cell. In August 2019, the DOC filed an opposition. Among the exhibits attached to the DOC's opposition was an affidavit signed by Christopher Fallon, then the Deputy Commissioner of Prisons in Massachusetts, detailing Sosa's extensive history of violence and disciplinary infractions.

Following a hearing in September 2019 on Sosa's February 2019 motion, the district court appointed counsel to represent him in the matter of the pending motion. The court also ordered the

DOC to arrange for Sosa to be examined by an independent physician to determine the condition of his shoulders.[1]

In compliance with this order, the DOC retained the services of orthopedic specialist Dr. Michael Elman.[2] After reviewing the 2004 MRI scan and recent x-rays, as well as performing a physical examination, Elman concluded that Sosa "certainly has evidence of severe bilateral glenohumeral arthritis,"[3] which limited his range of motion and was "clearly responsible for pain," particularly upon "internal rotation" of the shoulders. Elman also remarked that it seemed "understandable" that handcuffing behind the back would "stretch [Sosa's] shoulders into positions of discomfort."

Sosa retained a different orthopedic specialist, Dr. John Wixted, as an expert.[4] Following a review of Sosa's medical

---

[1] By an "independent" physician, the district court meant a physician that did not have a "position [of] responsibility" to the DOC or DOC personnel.

[2] Elman had a solo practice specializing in general orthopedics and arthroscopic surgery. He was not employed by the DOC.

[3] Glenohumeral arthritis refers to arthritis of the shoulder joint. See Stedman's Medical Dictionary 811 (28th ed. 2006).

[4] It is not clear from the record on what basis Dr. Wixted was retained as an expert or how he was paid. Indeed, prior to the February 7, 2020 motion hearing, the district court ruled that it would only consider the report of "the physician who conducted the independent medical examination of the plaintiff," referring to Dr. Elman. Nevertheless, the court subsequently decided to consider Wixted's report.

records and a physical examination, Wixted concurred with Elman's diagnosis that Sosa has "severe end stage arthritis in bilateral glenohumeral joints." As a result, Sosa's shoulders had "very limited internal rotation," which was "worse on the right [shoulder] than the left." Specifically, Wixted determined that Sosa's right shoulder only had fifty degrees of passive internal rotation, while his left shoulder had eighty degrees of passive internal rotation.

He explained further that because "[p]lacing one's hands behind the back" without discomfort requires at least 100 degrees of internal shoulder rotation, restraining Sosa's hands behind his back would force his arthritic shoulder joint beyond their limited range of motion, causing pain. As an alternative to using rear restraints, Wixted proposed restraining Sosa's hands at his sides, which would avoid any shoulder rotation and hence be significantly less painful.

After both medical experts had filed their reports, the district court held a second hearing on Sosa's February 2019 motion on February 7, 2020. At this hearing, the DOC explained the procedure it had voluntarily begun to use in restraining Sosa upon removal from his cell. First, Sosa would back up to the closed cell door and put his hands through the "wicket" -- a slot -- in the door. His hands would then be cuffed behind him using double cuffs. With Sosa thus secured, the cell door would be opened and

two prison officers would enter the cell, proceeding to transition him into waist chains.

At the same hearing, the DOC also proposed to have a set of custom handcuffs manufactured that would have a specially elongated chain. It planned to rear cuff Sosa with these custom handcuffs to initially secure him while in his cell, before transitioning him into waist chains upon being taken out of his cell. While the district court gave this proposal its approval, it also ordered the DOC to first consult with Dr. Elman to determine the appropriate length for the chain of the custom handcuffs.

On March 6, 2020, Sosa filed a Motion to Order the Department of Correction to Cease Using Painful Rear Restraints ("March 2020 motion"), which the DOC opposed. In this March 2020 motion, Sosa asserted that since the February 7 hearing, the DOC had shifted from its previous practice of transitioning him into waist chains when he is brought out of his cell to a new procedure where he was kept in rear cuffs -- albeit using double cuffs rather than a single handcuff -- when outside of his cell. In response to this alleged change in the DOC's restraint procedure, Sosa requested an order requiring the DOC (1) to initially rear cuff him in his cell with custom handcuffs modified to be at least three inches longer than double cuffs, and (2) to transition him from rear cuffs to waist chains upon removal from his cell. In support

of his motion, Sosa attached a letter from Dr. Wixted taking the view that for a modified rear restraint procedure to avoid pain to Sosa's shoulders, the chain would have to be long enough to allow his hands to "hang at his sides."

At a status conference held on March 10, 2020, the DOC insisted that its policy had always been to only transition DDU inmates into waist chains if they were being moved to a location outside the unit; when inmates are moved within the DDU, only rear cuffing is customarily used. A DOC official, Assistant Deputy Commissioner Sean Medeiros, explained to the court that frequently transitioning an inmate between rear cuffing and waist chains presented a "safety issue" because, during the moments when the inmate is uncuffed, "the officers become vulnerable."

The DOC also notified the district court that because it had not yet been able to consult with Dr. Elman about its proposed design for the custom handcuffs, it was continuing in the interim to use double cuffs to rear cuff Sosa. Sosa himself indicated that rear cuffing with double cuffs had been "a Godsend" that "helped alleviate" his pain "a great deal."

On March 11, 2020, Sosa was transferred to the Behavioral Management Unit ("BMU") at MCI-Cedar Junction on the referral of his mental health clinician. The BMU is a housing unit designed to provide clinically appropriate DDU inmates with programming and treatment with the aim of achieving sufficient behavioral

stability to allow a safe return to the general prison population. Nevertheless, because the BMU caters to inmates who have a record of perpetrating serious physical assaults, rear cuffing is used routinely to restrain BMU inmates when they leave their cells.

In line with this standard restraint policy, Sosa was secured by rear cuffing -- albeit with the modification of using double cuffs -- whenever he was moved from his cell to facilities within the BMU.  Because of the short distances between Sosa's cell and the facilities within the BMU, such as the shower, the medical triage room, and the therapeutic module, he would only remain in rear restraints for short time periods of up to four minutes at most.[5]  However, he frequently experienced rear cuffing because he was moved between his cell and facilities within the BMU multiple times a week.[6]  When traveling to a location outside the BMU, Sosa was transitioned into waist chains upon leaving his cell.

On March 18, 2020, the district court denied Sosa's February 2019 motion for a preliminary injunction "in the interest

---

[5] Sosa is usually not held in rear restraints when he is making use of a given facility.  For example, while receiving medical treatment in the triage room, he would be transitioned into waist chains.  When he is taken to the shower, which has a cell door with a wicket, his handcuffs are taken off and he is not restrained while showering.

[6] For example, the DOC represented to the district court that Sosa is allowed to shower at least three times a week.

of docket management," and informed counsel that it would "construe [Sosa's March 2020 motion] as a motion for preliminary injunction." Sosa v. Mass. Dep't of Corr., 494 F. Supp. 3d 37, 38 (2020). We understand the district court to have thereby consolidated the requests for relief in Sosa's February 2019 and March 2020 motions by treating Sosa's March 2020 motion as a motion for a preliminary injunction seeking an order compelling the DOC and other defendants: (1) to stop rear cuffing him with single handcuffs; (2) to further lengthen the custom handcuffs used to initially rear cuff him when in his cell, so that the custom handcuffs are at least three inches longer than double cuffs; and (3) to transition him from rear cuffs to waist chains whenever he is removed from his cell, including when he is only being moved within the BMU.[7]

In a status report filed the following month, the DOC explained that it had been unable to consult with Dr. Elman about the appropriate span for the custom handcuffs, citing the lockdown of all DOC correctional institutions as a response to the COVID-

---

[7] Against this characterization of the district court's denial of Sosa's February 2019 motion as a consolidation of both his February 2019 and March 2020 motions for reasons of administrative convenience, appellees contend that the district court was rejecting Sosa's earlier motion on its merits. But this interpretation of the district court's denial of Sosa's earlier pro se motion is difficult to square with the court's subsequent indication that it had denied that motion "in the interest of docket management." Sosa, 494 F. Supp. 3d at 38.

- 12 -

19 pandemic. To avoid further delays, the DOC had therefore, on its own initiative, ordered a set of double cuffs-length handcuffs to be manufactured.

By July 2020, when the district court held another status conference, the DOC reported further delays in obtaining a medical opinion from Dr. Elman because of continued COVID-19 restrictions on entry into its facilities. In response, the court allowed the DOC to consult with Dr. Frank, a different independent physician.[8] The DOC also reported that, since May 2020, it had begun restraining Sosa with the double cuffs-length custom handcuffs it had ordered to be manufactured. These custom handcuffs were, the DOC insisted, at the maximum length consistent with institutional security needs. At the status conference, the DOC's counsel also represented to the court that it was opposed to transitioning Sosa into waist chains when being moved within the BMU because it was "not . . . efficient" to transition him repeatedly between rear restraints and waist chains every time he was taken to the shower or other facilities within the BMU, particularly given the very short distances involved. At the same time, the DOC's counsel conceded that securing Sosa with waist chains presented no "security risk" and that waist chains "provide security."

_____

[8] This physician was independent in virtue of his employment by the Department of Public Health, rather than the DOC.

In late September 2020, a medical assessment of the impact on his shoulders of restraining Sosa using double cuffs-length handcuffs was finally conducted via telemedicine by a physician assistant working for Lemuel Shattuck Hospital. The report issued following this assessment stated that Sosa's shoulders retained 30 and 40 degrees of internal rotation in abduction on the left and right respectively. The report further stated that the double cuffs-length custom handcuffs internally rotated Sosa's shoulders about 20 degrees on each side. Restraining Sosa using the custom handcuffs therefore rotated and stretched his shoulders less than would standard handcuffs. Hence, the report concluded, the double cuffs-length handcuffs "reduce[d] somewhat" the pain Sosa experienced from rear cuffing compared to the application of standard handcuffs. Nevertheless, the report also indicated that Sosa still found rear cuffing with the custom handcuffs "painful."

On October 2, 2020, the district court held a status conference at which the DOC represented to the court that, when Sosa is moved within the BMU, he would continue to be rear cuffed using the double cuffs-length custom handcuffs. The DOC reiterated its view that further extension of the custom handcuffs would unacceptably compromise security, because Sosa would then find it easier, by pulling the handcuff chain under his feet, to maneuver his hands from his rear to his front, where he would have the range

of motion to strike officers and others around him.  When the court drew attention to the September 2020 medical report concluding that the double cuffs-length custom handcuffs alleviated Sosa's pain from rear cuffing, his counsel insisted that while the extended handcuffs did cause less pain, rear cuffing was still extremely painful if continued for a sustained period of time.

Following this status conference, the district court allowed in part and denied in part Sosa's March 2020 motion for a preliminary injunction.  Sosa's motion was allowed to the extent that the DOC was ordered to stop rear cuffing him with standard single handcuffs.  The court also "directed" the DOC to "continue to use" the double cuffs-length custom handcuffs that "allow[ed] Mr. Sosa's arms to be shackled at, or just behind, his hips" when applying rear cuffing, although Sosa had not specifically requested this relief.  Sosa, 494 F. Supp. at 39.

Sosa's motion was denied to the extent that the court refused to issue a preliminary injunction ordering the DOC to further alter the procedure used to restrain Sosa for movements within the BMU by (1) extending the custom handcuffs used to initially secure him in his cell by an additional three inches or more, and (2) transitioning him into waist chains once he is taken out of his cell.  As the district court explained, it premised this denial of relief on the assumption that the DOC would continue using double cuffs-length custom handcuffs when rear cuffing Sosa.

The court based that assumption on its recognition that the DOC had by then been using those handcuffs "for an extended period of time," that the DOC had "agreed to continue to use them," and that the DOC was being "directed" by the court itself to continue to use them.  Sosa, 494 F. Supp. at 39.

Sosa timely appealed from the partial denial of his requests for preliminary relief.[9]

**II.**

**A.  Standard of review**

We have cautioned that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 5 (1st Cir. 2022) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).  To be granted a preliminary injunction, a plaintiff "must establish" the following four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Dist. 4 Lodge of the Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 39 (1st Cir. 2022) (quoting Winter, 555 U.S. at 20).

---

[9] Only the district court's partial denial of Sosa's request for preliminary relief is before us; the DOC does not challenge the court's partial grant of relief.

As a "civil action with respect to prison conditions" for purposes of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(g)(2), Sosa's pursuit of a preliminary injunction must also navigate the particular requirements for prospective relief established by that statute.[10] The PLRA defines "prospective relief" broadly as "all relief other than compensatory monetary damages." See § 3626(g)(7). Where a plaintiff in a prison-conditions case seeks prospective relief so defined, the PLRA bars the allowance of the requested relief unless it is "narrowly drawn, extends no further than necessary to correct the violation of the [plaintiff's] Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." § 3626(a)(1)(A).

For two reasons, our review of the district court's denial of preliminary relief focuses on the likelihood that Sosa will succeed on the merits with his Eighth Amendment and ADA claims. First, since the PLRA restricts the availability of prospective relief -- including Sosa's request for preliminary injunctive relief -- to what is necessary and narrowly drawn to correct the violation of the plaintiff's federal rights, see Miller

_____

[10] The PLRA defines a "civil action with respect to prison conditions" as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by governmental officials on the lives of persons confined in prison." § 3626(g)(2).

- 17 -

v. French, 530 U.S. 327, 333 (2000); Crawford v. Clarke, 578 F.3d 39, 43-44 (1st Cir. 2009), the district court could not have issued a preliminary injunction consistent with the PLRA's requirements without first determining that Sosa's federal constitutional and statutory rights were likely violated.

Second, in denying Sosa's request for preliminary relief, the district court relied entirely on its negative assessment of Sosa's likelihood of success on the merits. The court's sole stated reason for partially denying Sosa's requested preliminary relief was its conclusion that rear cuffing with double cuffs-length custom handcuffs -- which was the restraint method that the DOC had been using, agreed to continue using, and was being directed by the court to continue to use -- "represent[s] a reasonable accommodation that avoids a substantial risk of causing Mr. Sosa undue harm while still allowing the DOC to maintain safety and security for its officers." Sosa, 494 F. Supp. 3d at 39. We infer that, with this statement, the court was addressing Sosa's likelihood of success with both his Eighth Amendment claim and his ADA claim.

In examining the district court's conclusion that Sosa was unlikely to succeed on the merits, we review the court's "rulings on abstract legal issues de novo," and any supporting "findings of fact for clear error." Dist. 4 Lodge, 40 F.4th at 39 (quoting Water Keeper All. v. U.S. Dep't of Def., 271 F.3d 21, 30

(1st Cir. 2001)).  Only having reviewed the court's conclusion that Sosa was unlikely to prevail on the merits will we test "the district court's . . . ultimate decision to deny [a] preliminary injunction for abuse of discretion."  Together Emps., v. Mass Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022) (quoting Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021)).

Because the court stated the findings and reasoning underlying its conclusion on the likelihood-of-success factor tersely, our review sometimes proceeds by inferring the court's findings and reasoning.  Cf. Victim Rights Law Ctr. v. Rosenfelt, 988 F.3d 556, 563 (1st Cir. 2021) ("[The Court of Appeals] offers deference to the district court's decisionmaking to the extent its 'findings or reasons can be reasonably inferred.'" (quoting Cotter v. Mass. Ass'n of Minority Law Enf't Officers, 219 F.3d 31, 34 (1st Cir. 2000))).  Where "the district court made no specific findings, we can do so, relying on the record."  T-Mobile Ne. LLC v. Town of Barnstable, 969 F.3d 33, 38 (1st Cir. 2020) (quoting Geiger v. Foley Hoag LLP Ret. Plan, 521 F.3d 60, 64 (1st Cir. 2008)).  Where the district court's reasoning cannot be inferred, we inquire into whether we "may affirm its order on any independent ground made apparent by the record."  United States v. Castillo-Martinez, 16 F.4th 906, 915 (1st Cir. 2021) (quoting United States v. Cabrera-Polo, 376 F.3d 29, 31 (1st Cir. 2004)).

**B. Likelihood of Success on the Merits**

**1. Eighth Amendment claim**

Sosa contends that, by denying him adequate medical care, the DOC subjects him to cruel and unusual punishment in violation of the Eighth Amendment, as made applicable to the states by the Fourteenth Amendment. See Robinson v. California, 370 U.S. 660, 667 (1962). The medical care at issue, he argues, is the denial of a restraint method that would reduce the pain he experiences from being rear cuffed with double cuffs-length custom handcuffs by first rear cuffing him in his cell with additionally extended custom handcuffs before transitioning him into waist chains upon removal from his cell.

We acknowledge that it is unclear whether the restraint procedure Sosa requests but the DOC refuses to provide qualifies as medical care. While his requested restraint procedure is expected to alleviate the pain caused by the interaction of the challenged restraint procedure with his arthritis, it would not cure or treat his underlying disease. On the other hand, there is a recognized medical specialty dedicated to the prevention of pain, namely pain medicine.[11] To the extent that Sosa's requested

---

[11] As the American Academy of Pain Medicine defines this specialty, it is "concerned with the study of pain, prevention of pain, and the evaluation, treatment, and rehabilitation of persons in pain." What Is Pain Medicine?, American Academy of Pain Medicine, https://painmed.org/what-is-pain-medicine/.

procedure would alleviate his shoulder pain, it could perhaps be characterized as a form of medical care falling within this specialty.  We need not decide here whether Sosa's framing of his Eighth Amendment claim as a denial of adequate medical care is correct, however, because even if we were to take this framing on its own terms and assess whether Sosa was denied adequate medical care, his claim would fail.

Under the Eighth Amendment's prohibition on cruel and unusual punishment, prison officials "must ensure that inmates receive adequate . . . medical care."  Farmer v. Brennan, 511 U.S. 825, 832 (1994); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976) (explaining that Eighth Amendment principles establish "the government's obligation to provide medical care for those whom it is punishing by incarceration.").  The inquiry into whether an inmate has been deprived of constitutionally adequate medical care has two components, one objective and one subjective.

The objective component requires that the medical needs of the inmate seeking care be "sufficiently serious."  Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment," or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (quoting Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir.

2014). Here, the district court found that Sosa "suffers from a severe shoulder condition" that reduces the range of motion of his shoulder joints. Sosa, 494 F. Supp. 3d at 38. The court could therefore properly have concluded -- and the parties do not dispute -- that Sosa has a medical condition that is sufficiently serious for purposes of the objective component of the inadequate medical care inquiry.

Subjectively, prison officials must possess a "sufficiently culpable state of mind" amounting to "deliberate indifference to the [inmate's] health or safety." Zingg, 907 F.3d at 635 (citing Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015)). To meet the deliberate indifference standard, prison officials must either deny "needed medical treatment in order to punish the inmate," or display "'wanton' or criminal recklessness in the treatment afforded." Id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)). In other words, an official who "knows of and disregards an excessive risk to inmate health" is deliberately indifferent. Farmer, 511 U.S. at 837. This deliberate indifference can include conscious and unjustified failure to relieve an inmate's physical pain. See Hudson v. McMillian, 503 U.S. 1, 5 (1992) ("[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)); Kosilek, 774 F.3d at 82 (citing Estelle, 429 U.S. at 103)

- 22 -

("Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment.").

Crucially, however, prison officials lack the culpable mental state required for Eighth Amendment liability where, having actual knowledge of a "substantial risk to inmate health," they "respond[] reasonably to the risk." Farmer, 511 U.S. at 844; see also Kosilek, 774 F.3d at 84. Whether a given response to a substantial risk to inmate health is reasonable depends on whether it appropriately balances "security and administrative concerns," Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir. 1993), with meeting the inmate's medical needs. For this reason, even an outright "denial of care" may not evince deliberate indifference if that decision is sufficiently justified by "legitimate concerns" of prison administration such as "institutional security." Kosilek, 774 F.3d at 83; see also Battista v. Clarke, 645 F.3d 449, 454 (1st Cir. 2011) (explaining that if prison officials' "balancing judgments" between inmate medical need and "security considerations" are "within the realm of reason and made in good faith," withholding of desired medical care is not deliberate indifference).

Here, the district court stated that, in rear cuffing Sosa with custom-made double cuffs-length handcuffs, the DOC framed a "reasonable accommodation" that "avoid[ed] a substantial

risk of causing [him] undue harm" while also "maintain[ing] safety and security for its officers." Sosa, 494 F. Supp. 3d at 39. We infer from this language that the court reasoned that there was no deliberate indifference under Farmer, 511 U.S. at 844, because the custom handcuffs represented a reasonable response to Sosa's medical needs. And because he would therefore be unable to establish the subjective component of his inadequate medical care claim, the court concluded that he was unlikely to succeed in establishing that claim on the merits.

On appeal, Sosa argues that the restraint procedure used by the DOC does in fact evince deliberate indifference because it does not reasonably balance the risk of pain to him with the legitimate concerns of prison administration. On the one hand, due to his shoulder condition, any restraint method other than those allowing Sosa's arms to hang at the sides -- such as his requested restraint procedure -- caused him significant pain. On the other hand, there was no genuine security reason not to transition him to waist chains when transported out of his cell, since the only reason cited was the inadequate justification of avoiding inconvenience to prison personnel. As such, restraining him for movements within the BMU by rear cuffing with double cuffs-length custom handcuffs amounted to deliberate indifference to his shoulder pain.

First, we address Sosa's contention that rear cuffing him with double cuffs-length handcuffs continues to inflict significant pain. We infer from the district court's statement that the DOC's modified cuffing procedure "avoid[ed] a substantial risk of causing Mr. Sosa undue harm," Sosa, 494 F. Supp. 3d at 39, that the court found that whatever residual pain Sosa suffered, the modified procedure substantially relieved the pain he previously experienced from rear cuffing with standard single handcuffs. In making this finding, the court apparently relied, in particular, on two pieces of evidence. First, there was the medical report issued after Sosa's September 2020 medical evaluation, which concluded that rear cuffing with the custom handcuffs "reduce[d] the rotation and stretching" of Sosa's shoulders, which "alleviate[d] to some degree the pain" he experienced. Id. at 38. Second, there was Sosa's own "conce[ssion] that the custom handcuffs significantly reduced the pain" to his shoulders. Id.

Our review of the record reveals no clear error in the district court's factual finding that Sosa experienced significantly less pain from rear cuffing with double cuffs-length custom handcuffs than he did with standard single handcuffs. According to the medical report the district court relied on, rear cuffing with the custom handcuffs caused internal shoulder rotation only within his shoulders' remaining range of motion,

- 25 -

thereby reducing -- even if not completely eliminating -- his shoulder pain. Moreover, Sosa himself represented to the district court that "[t]he double handcuff behind the back has been a Godsend" that "helped alleviate" his pain "a great deal."

To be sure, Sosa has attested in an affidavit that the DOC's modified rear cuffing procedure was "still painful." However, as appellees emphasize and the record confirms, the period of time that Sosa spent in rear cuffs each time he was moved within the BMU was very brief: it took four minutes at most to travel between his cell and other facilities within the BMU, and he was generally not kept in rear restraints once securely in the shower, triage room, or other facilities within the BMU. Because Sosa was only held in rear cuffs for brief periods each time, any pain he experienced was therefore limited. We infer that the district court took the brevity of the pain Sosa experienced into consideration in making its determination that the DOC's use of double cuffs-length custom handcuffs was a reasonable response to Sosa's complaints of pain from rear cuffing.

Importantly, the presence of reduced residual pain for a limited period of time implicates the Supreme Court's pronouncement that the response of prison officials to a threat to inmate health may be reasonable "even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. In the context of evaluating the reasonableness of the response of prison officials

to inmate pain, we have explained that it is only "[u]ndue suffering" -- that is, suffering serving no "legitimate penological purpose" -- that the Eighth Amendment forbids. See Kosilek, 774 F.3d at 82 (emphasis added) (citing Estelle, 429 U.S. at 103).

Hence, the question whether the DOC reasonably refused to adopt Sosa's requested restraint procedure crucially depends on whether his desired procedure would compromise legitimate penological objectives. We infer from the court's reference to the DOC's interest in "maintain[ing] safety and security for its officers," Sosa, 494 F. Supp. 3d at 39, that it found that the use of additionally extended custom handcuffs to restrain Sosa posed a genuine and significant risk to institutional security, the maintenance of which is "perhaps the most legitimate of penological goals." Overton v. Bazzetta, 539 U.S. 126, 133 (2003).

We discern no clear error in the district court's factual finding that there was a legitimate security risk, which is amply supported by the record. The DOC twice represented to the court that additional extension of the custom handcuffs beyond double cuffs-length would compromise security. With a longer handcuff chain, Sosa would more easily be able to maneuver his hands from behind him to his front, enabling him to strike officers more easily. The DOC's fear that Sosa might attack officers was well-founded, given his lengthy history of violent infractions of prison

discipline.  And, given the finding that additional extension of the custom handcuffs would significantly compromise security, the district court could properly have concluded that security concerns justified refusing Sosa's requested extension.

We review next the district court's related and implied determination that the DOC reasonably refused to transition Sosa into waist chains whenever he is moved from his cell to another location within the BMU.  While Sosa contends that there is no genuine security justification for the DOC's refusal, and that the real motivation for this decision was an inadequate efficiency concern, the record discloses genuine security interests that support the reasonableness of the DOC's decision.

As the DOC explained to the district court, the security concerns surrounding any routine transitioning of Sosa to waist chains arise from the dangers inherent in the moments of transition themselves, when officers are vulnerable.  Since Sosa makes use of facilities within the BMU multiple times a week,[12] if he must be transitioned into waist chains each time he is removed from his cell, prison officers will frequently be exposed to danger during the numerous moments of transition.  Thus, there is ample support in the record for the district court's implied finding that routinely transitioning Sosa into waist chains would compromise

---

[12] Indeed, Sosa himself contends that he is rear cuffed to move around the BMU "on an almost daily basis."

the "safety and security of [DOC] officers."[13]  Sosa, 494 F. Supp. 3d at 39.

In sum, the district court properly concluded that (1) the DOC responded reasonably to Sosa's shoulder pain in adopting a modified rear cuffing procedure using double cuffs-length custom handcuffs, rather than using his requested restraint method, and (2) for that reason, Sosa is unlikely to succeed with his Eighth Amendment claim that appellees inflicted cruel and unusual punishment through deliberate indifference to his medical needs.

**2. ADA claim**

Under Title II of the ADA, a "qualified individual with a disability" shall not, "by reason of" that disability, be "excluded from participation in or be denied the benefits of the services, programs, or activities" provided by a "public entity," or otherwise "be subjected to discrimination" by such an entity. 42 U.S.C. § 12132.  State prisons are public entities for Title II purposes.  See United States v. Georgia, 546 U.S. 151, 154 (2006); Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 213 (1998).  To establish a prima facie case of a Title II violation, a plaintiff

---

[13] The DOC counsel's statement to the district court that waist chains "provide security" does not undermine this finding. There is no inconsistency between (1) the factual assertion that when Sosa is already being restrained with waist chains, he is sufficiently secured to provide security and (2) the factual assertion that Sosa poses a security risk in the moment of transition from rear cuffs to waist chains -- that is, before he has been fully secured with waist chains.

must show that: (1) he is a "qualified individual with a disability"; (2) he was "excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against"; and (3) this exclusion, denial of benefits, or discrimination was "by reason of [his] disability." Snell v. Neville, 998 F.3d 474, 499 (1st Cir. 2021) (quoting Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 283 (1st Cir. 2006)).

Courts have recognized that a claim under Title II may be premised on one of three theories of discrimination: (1) intentional discrimination or disparate treatment; (2) failure to make a reasonable accommodation; (3) disparate impact. See, e.g., Richardson v. Clarke, 52 F.4th 614, 619 (4th Cir. 2022); Payan v. L.A. Cmty. Coll. Dist., 11 F.4th 729, 738 (9th Cir. 2021); Hamilton v. Westchester Cnty., 3 F.4th 86, 91 (2d Cir. 2021).

An intentional discrimination Title II claim alleges "outright intentional exclusion" from opportunities, which Congress found to be one of the "forms of discrimination" that individuals with disabilities "continually encounter." 42 U.S.C. § 12101(a)(5). But Congress also recognized that the "failure to make modifications to existing . . . practices" can also be a form of discrimination against individuals with disabilities, id., since facially neutral practices and policies will often specially

- 30 -

burden particular individuals with disabilities with respect to accessing opportunities.

For this reason, public entities are required under Title II to "make reasonable modifications" in their "policies, practices, or procedures" if these are "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). However, a public entity is not required to make modifications that would "fundamentally alter the nature of" the services, programs, and activities it provides, id., or that would impose on it an "undue burden," Toledo v. Sanchez, 454 F.3d 24, 32 (1st Cir. 2006). A Title II claim premised on a failure to provide a reasonable accommodation -- or, in other terminology, to make reasonable modifications[14] -- thus alleges that: (1) due to the claimant's disability, he needs an individualized change to a public entity's facially neutral policies, practices, or procedures if he is to effectively access some opportunity; but (2) the public entity unjustifiably failed to make that change. See Payan, 11 F.4th at 738.

Finally, a disparate impact Title II claim is closely related to a reasonable accommodation claim, in that both theories

---

[14] While Title II of the ADA uses the term "reasonable modifications" and Title I uses the more familiar term "reasonable accommodation," these terms are often used interchangeably. See Payan, 11 F.4th at 738 n.4; Pollack v. Reg'l Sch. Unit 75, 886 F.3d 75, 80, 80 n.3 (1st Cir. 2018).

of disability discrimination allege that a public entity's facially neutral rule specially burdens disabled individuals' meaningful access to a public service, program, or activity, or some other opportunity, and both seek a reasonable modification in the facially neutral rule to alleviate that burden. See id. The key difference between these two theories is that a reasonable accommodation claim focuses on "an individualized request or need" for a reasonable modification, while a disparate impact claim alleges a more "systemic" obstacle to access. Id.

Sosa premises his ADA claim on a reasonable accommodation theory. He contends that his requested restraint procedure, because it would alleviate the restraint-induced pain in his arthritic shoulders, constitutes medical care. Medical care is, we have recognized, a "service, program, or activity" covered by Title II. See Kiman, 451 F.3d at 284. He also argues that, because his requested restraint procedure would alleviate the remaining shoulder pain he suffers without creating any genuine security risk, that procedure represents a reasonable modification or accommodation. By failing to reasonably modify its restraint procedures in the way he requests, then, the DOC effectively excluded him from medical care in violation of Title II.

In asserting that his requested restraint procedure does not create a genuine security risk and is therefore a reasonable accommodation, Sosa is disputing the district court's implied

factual findings and its legal conclusions regarding his ADA claim. We infer from the language of the court's order that it found that Sosa's requested restraint procedure would compromise institutional security, whereas rear cuffing him using the custom-made double cuffs-length handcuffs would "maintain[] safety and security" while also easing his shoulder pain. Sosa, 494 F. Supp. 3d at 39. For that reason, the DOC's use of the custom handcuffs was a "reasonable accommodation," and, accordingly, the DOC did not subject Sosa to disability discrimination by failing to provide him with a reasonable accommodation. Id.

Echoing the district court, appellees insist that Sosa's requested restraint method would not be a "reasonable" modification because it would compromise institutional security. Since the double cuffs-length custom handcuffs alleviate Sosa's shoulder pain without creating an unacceptable security risk, appellees contend, that restraint procedure already provides him with a reasonable accommodation for his disability.

We begin our review of the district court's treatment of Sosa's ADA claim by noting some difficulties in the way that Sosa frames his claim. First, as we discussed in connection with his Eighth Amendment claim, it is uncertain whether Sosa's requested restraint procedure can properly qualify as medical care. Second, Sosa's framing of his ADA claim appears circular. The "service, program, or activity" from which he alleges that he has been

- 33 -

effectively excluded is identical to the reasonable accommodation that he needs to achieve meaningful access to that "service, program, or activity": both are the specific modification in the standard BMU restraint procedure he requests.

We illustrate the poor fit of Sosa's framing with the reasonable accommodation theory of disability discrimination by comparing Sosa's framing of his claim with another reasonable accommodation claim made in the prison context that we considered in Kiman, 451 F.3d 274. In that case, an inmate in a New Hampshire state prison, Matthew Kiman, suffered cramping in his shoulder muscles which caused him pain when he was subject to rear cuffing. Id. at 288. He alleged that the pain he experienced from rear cuffing "affected his access to a variety of the 'services, programs, or activities' covered by Title II of the ADA." Id. at 288-89 (quoting 42 U.S.C. § 12132). To achieve meaningful access to various services, programs, and activities within the prison, therefore, Kiman needed a reasonable accommodation in the form of a modified restraint procedure, namely front cuffing. The prison's failure to use front cuffing to restrain him was therefore, he urged, disability discrimination in violation of Title II. Id. By contrast, Sosa does not allege that his shoulder pain impedes him from accessing the kind of prison services, programs, and activities that Kiman sought access to. Instead, he argues that his requested restraint procedure is itself a "service, program,

or activity" under Title II to which he lacks meaningful access, while also maintaining that this modified restraint procedure is a reasonable accommodation that he needs to achieve that meaningful access.

For the purposes of this appeal, we choose to ignore these serious difficulties in Sosa's framing of his ADA claim and follow the district court in evaluating that claim under a reasonable accommodation theory, because we conclude that, even on its own terms, his claim still fails.

"[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Mary Jo C. v. N.Y. State & Loc. Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013) (quoting Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995)). A modification is not "reasonable" if it would "result in a fundamental alteration of [the service provided by the public entity] or impose an undue burden." Toledo, 454 F.3d at 32 (citing Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000)). Moreover, "[t]erms like 'reasonable' and 'undue' are relative to circumstances," and the circumstances of a prison that we are faced with here are "different from those of a school, an office, or a factory."

Crawford v. Ind. Dep't of Corrs., 115 F.3d 481, 487 (7th Cir. 1997). Specifically, "security concerns . . . are highly relevant to determining the feasibility of the accommodations that disabled prisoners need in order to have access to desired programs and services." Id.

Here, as we have already explained, the record supports the district court's implied finding that Sosa's requested restraint procedure poses a significant risk to institutional security. While additional extension of the custom handcuffs and the use of waist chains would alleviate Sosa's residual pain, the security risk created by these restraint procedures mean that they are not "reasonable" modifications. In refusing to adopt Sosa's requested restraint procedure, then, the DOC did not subject him to disability discrimination by failing to provide a reasonable accommodation.

## III.

The district court correctly determined that Sosa is unlikely to succeed on the merits of his Eighth Amendment claim, because the DOC responded reasonably to his medical needs, belying any claim of deliberate indifference. The district court also properly concluded that Sosa is unlikely to prevail on the merits of his ADA claim, because the DOC's refusal to adopt his requested restraint procedure did not fail to provide him with a reasonable accommodation for his shoulder pain. Hence, the district court

did not abuse its discretion in partially denying Sosa's request for preliminary relief.

     <u>Affirmed</u>.